WEINBERG, ROGER & ROSENFELD
ASHLEY K. IKEDA 2955-0
Central Pacific Plaza
220 South King Street, Suite 901
Honolulu, HI 96813
Telephone: 808-528-8880
Facsimile: 808-528-8881
E-mail: aikeda@unioncounsel.net
*Attorneys for Plaintiffs Ian Bell and Marc D'Annunzio*

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH (*pro hac vice*)
SHANE P. SANDERS (*pro hac vice*)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619-525-3990
Facsimile: 619-525-3990
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        ssanders@robbinsarroyo.com
*Attorneys for Plaintiff Ian Bell*

RM LAW, P.C.
RICHARD A. MANISKAS (*pro hac vice*)
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone: 484-324-6800
Facsimile: 484-631-1305
E-mail: rmaniskas@rmclasslaw.com
*Attorneys for Plaintiff Ian Bell*

HYNES KELLER & HERNANDEZ, LLC
BETH A. KELLER (*pro hac vice*)
118 North Bedford Road, Suite 100
Mount Kisco, NY 10549
Telephone: 914-752-3040
Facsimile: 914-752-3041
E-mail: bkeller@hkh-lawfirm.com
*Attorneys for Plaintiff Marc D'Annunzio*

[Caption on following page.]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN RE ECO SCIENCE SOLUTIONS, INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Civil No. 1:17-cv-00530 |
| | (Consolidated with No. 1:18-cv-00016) |
| This Document Relates To: | **VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT; VERIFICATION OF IAN BELL; VERIFICATION OF MARC D'ANNUNZIO; DEMAND FOR JURY TRIAL; CERTIFICATE OF SERVICE** |
| ALL ACTIONS. | |

**VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT**

Plaintiffs Ian Bell and Marc D'Annunzio, by their attorneys, allege for this Verified Consolidated Stockholder Derivative Complaint against defendants upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiffs on behalf of nominal defendant Eco Science Solutions, Inc. ("Eco Science," "ESSI" or the "Company") against certain of its officers and directors for breaches of fiduciary duties, aiding and abetting, waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Eco Science's reputation, goodwill, and standing in the business community.  In addition to committing millions of dollars' worth of Company resources to worthless products and services, these actions have exposed the Company to hundreds millions of dollars in potential liability for violations of federal law.

2.      According to its website, Eco Science claims to provide "enterprise software solutions," including consumer applications for mobile phones ("apps") and e-commerce platforms focused on the health and wellness industry.  Eco Science targets the "social media consumer user market."  To accomplish this, the Company purportedly produces initiatives centered on educating and connecting social media users with various holistic health, wellness, and alternative medicine businesses, especially in the burgeoning cannabis industry.

3.      The reality is, however, Eco Science has become a front for defendant Gannon Giguiere's ("Giguiere") latest pump-and-dump scheme designed to enrich

himself at the expense of unsuspecting investors. In furtherance of his latest dubious endeavor, defendant Giguiere allied himself with defendants Jeffrey Taylor ("J. Taylor") and Don Lee Taylor ("D. Taylor") who are brothers and Eco Science's controlling majority stockholders. Defendants J. Taylor and D. Taylor, who are also the Company's self-appointed Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, were willing to use their control of Eco Science to further defendant Giguiere's scheme and line their own pockets in breach of their fiduciary duty and to the detriment of the Company.

4. In particular, shortly after taking over the operations of the Company in January 2016, defendants J. Taylor and D. Taylor on behalf of Eco Science signed a Technology Licensing and Marketing Support Agreement with Separation Degrees – One, Inc. ("SDOI"). SDOI is an unlisted "marketing and e-commerce" company in which defendant Giguiere serves as Chairman, CEO, President, and Secretary. In addition, the Company reported that it had entered into an Asset Purchase Agreement with SDOI. In exchange for 1,000 shares of the Company's Series A voting preferred stock, Eco Science acquired what the Individual Defendants (as defined herein) described as a proprietary messaging and customer relationship management "software platform." As detailed herein, this agreement was strikingly similar to asset purchase agreements that defendant Giguiere used in previous schemes.

5.     SDOI was also hired to promote this software platform, supposedly used in two mobile apps, Fitrix and Herbo.  However, these apps had limited functionality and generated no revenue. In reality, instead of marketing these products, SDOI was artificially pumping up Eco Science stock in articles on market research websites over the course of 2016.  The articles touted Eco Science as the potential next Amazon of the cannabis industry.  While the stock remained inflated as a result of this so-called "service," the Company provided defendant Giguiere with stock worth millions of dollars by converting SDOI's invoices to the Company to Eco Science shares.

6.     On December 15, 2016, an article published by *Seeking Alpha* detailed the Individual Defendants' manipulative advertising practices used in implementing Eco Science's agreement with SDOI.  The article revealed that the Company was largely an empty shell, with limited operations that did not warrant the Company's inflated valuation.  Despite the marketing agreement with SDOI, the report stated that the Company had only attracted six subscribers to its two YouTube channels and only a few hundred downloads of the overly-simplistic Herbo and Fitrix apps for Android devices.  Moreover, the article highlighted defendants J. Taylor and D. Taylor had no experience in developing social media networking or e-commerce platforms, let alone in the holistic health, wellness, and alternative medicine industries.

7.     Over the next several days, as the news was disseminated to the investing public, the Company's stock price continued to decline.  In total, the Company's stock price fell almost 47% sinking to $1.43 per share, a loss of $1.25 per share, or a total drop of $40.9 million in market capitalization by December 20, 2016.

8.     This report, however, did not deter defendants J. Taylor and D. Taylor from continuing their scheme with defendant Giguiere.   In January 2017, defendants J. Taylor and D. Taylor caused Eco Science to agree to sell ten million shares of the Company's stock in a purported financing transaction to Phenix Ventures, LLC ("Phenix") – a company in which defendant Giguiere served as a managing member.   This toxic financing deal allowed defendant Giguiere to purchase Eco Science shares at a steep discount[1] through the front of his company Phenix.  As defendant Giguiere had done in previous similar schemes, he could then quickly dump those shares for a profit at the inflated price propped up by the aforementioned false marketing.  The massive dilution from defendant Giguiere's sales would cause the Company's stock price to plummet.  He could then purchase more stock at a discount to this already deflated price, ensuring defendant Giguiere

---

[1] According to the Equity Purchase Agreement dated January 15, 2017, and attached to the Current Report on Form 8-K filed with the SEC on January 26, 2017, the Company was to sell to Phenix up to ten million shares at 83% of the average volume weighted average price ("VWAP") on the principal market.

always made a profit.  This death spiral scenario continually weakens the Company's stock price, which in turn makes the shares unattractive to new investors and severely limits the Company's ability to obtain new financing from creditors on favorable terms.

9.     Defendants J. Taylor and D. Taylor also engaged in self-dealing designed to line their pockets at the expense of the Company, in breach of their fiduciary duty.  In January 2017, defendants J. Taylor and D. Taylor, while the Company's sole directors, awarded themselves three million shares each of the Company's restricted stock. These self-dealing stock awards were worth over $16 million in total.

10.    Further, while awaiting SEC approval of a Form S-1 Registration Statement that would allow defendant Giguiere to sell his newly acquired shares, the Individual Defendants continued to pump up Eco Science stock with smoke and mirrors.  In a May 5, 2017 press release, the Company touted to the investing public that it had signed a Letter of Intent with the so-called Ga-Du Bank, Inc. ("Ga-Du Bank") to acquire full ownership of the bank in a stock and cash transaction.  The Company reported that it had received initial commitments from "prospects" to deposit sums between $300 million to $600 million.

11.    Another *Seeking Alpha* article, published on May 15, 2017, however, revealed that Eco Science's acquisition of the Ga-Du Bank was a sham.  The

Company claimed the bank was regulated by the newly-founded Central Bank of the Southern Cherokee Nation and The Red Fire People, but the article revealed that this supposed sovereign nation is not among the Native American tribes recognized by the Bureau of Indian Affairs.[2]  According to the article's author, the Company's May 5, 2017 press release was part of the Individual Defendants' attempt to fraudulently keep Eco Science's stock afloat while the SEC considered the Company's Form S-1 statement registering the fourteen million shares defendant Giguiere had accumulated.  The article further exposed the extent of the Individual Defendants' pump-and-dump scheme perpetrated on Eco Science, and revealed that defendant Giguiere had engaged in similar schemes with other entities in the past that lead to the complete erosion of the equity value of the stock.

12.    On May 19, 2017, the SEC issued a release that announced the temporary suspension of trading in the securities of Eco Science pursuant to section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act").  The SEC expressed concerns about the accuracy and adequacy of publicly disseminated information concerning the Company's proposed acquisition of Ga-Du Bank.

13.    When trading resumed on June 6, 2017, the Company's stock closed at

---

[2] The U.S. Department of the Interior is the agency that maintains legal and political relationships with Native American tribes in the United States.  Plaintiffs, through their counsel, have confirmed that the Southern Cherokee Nation and The Red Fire People are not among the tribes recognized by the Bureau of Indian Affairs.

$0.65 per share, a steep decline of $1.72 per share, or over 72%, from the Company's closing price of $2.37 on May 19, 2017, representing a $78 million market capitalization loss.  While the Individual Defendants were engaged in this detrimental pump-and-dump scheme, Eco Science's stock plummeted from a high of $4.58 per share on January 20, 2017, to a low of $0.28 per share on June 12, 2017, a loss of $4.30 per share.  Overall, market capitalization fell more than $137 million, or approximately 91% of its value.  The Company's stock has yet to recover as of the filing of this complaint.

14.   The revelation of the sham transaction with Ga-Du Bank and its detrimental effect on the Company has not deterred the Individual Defendants' continued advancement of their scheme.  A Current Report on Form 8-K filed with the SEC on October 6, 2017, promoted the assignment to Ga-Du Bank, now referred to as Ga Du Corporation, of all rights, interest in, on obligations under a License and Master Marketing Agreement ("LMMA") with the so-called Alliance Financial Network, Inc. ("Alliance").  Under the LMMA, Alliance would provide Ga Du Corporation with "certain financial and marketing services to businesses and individuals, including the Cannabis Industry."  According to the Form 8-K, Alliance also operates a mobile app called eXPO, through which Alliance supposedly provides financial and marketing services to businesses and individuals "which are challenged in the traditional banking systems."  For this assignment,

designed to keep Eco Science's stock afloat, Ga Du Corporation issued 200,000 shares of Eco Science common stock.

15.    The revelation that Eco Science, under the supervision and direction of the Individual Defendants, engaged in sham agreements with SDOI, Phenix, and the Ga-Du Bank to manipulate the Company's stock price and provide defendant Giguiere millions in Company stock caused harm to the Company.  As part of the Individual Defendants' scheme, defendants J. Taylor and D. Taylor also approved the issuance of millions of shares of Eco Science stock to defendant Giguiere without any reciprocal benefit to the Company.  In addition to the steep decline in market capitalization, the Company suffered damages to its reputation and goodwill, affecting its ability to raise additional equity capital from investors or debt financing from its creditors crucial to a small cap company's survival.

16.    Moreover, this action concerns the harm caused to the Company by the Individual Defendants due to their responsibility for making or approving of improper statements concerning Eco Science's business, operations, and prospects. In those public statements, the Individual Defendants made false assertions about the use of advertising funds, which were being used to promote the Company's stock in furtherance of a classic "pump-and-dump" scheme.   The Individual Defendants also disseminated false information concerning a proposed acquisition of the so-called Ga-Du Bank to keep the stock afloat as a continuation of this

pump-and-dump scheme.   In making and causing the Company to issue the improper statements regarding its operations, the Individual Defendants breached their fiduciary duties owed to the Company and its stockholders.

17.    As a direct result of this unlawful course of conduct, the Company is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the District of New Jersey on behalf of investors who purchased Eco Science's shares.

## JURISDICTION AND VENUE

18.    Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

19.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

20.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Eco Science maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained

of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Eco Science, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

21.    Plaintiff Marc D'Annunzio was a stockholder of Eco Science at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Eco Science stockholder.  Plaintiff D'Annunzio is a citizen of New York.

22.    Plaintiff Ian Bell was a stockholder of Eco Science at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Eco Science stockholder.  Plaintiff Bell is a citizen of North Carolina.

**Nominal Defendant**

23.    Nominal defendant Eco Science is a Nevada corporation with principal executive offices located at 1135 Makawao Avenue, Suite 103-188, Makawao, Hawaii.  Accordingly, Eco Science is a citizen of Nevada and Hawaii. Eco Science is a health and wellness bio and software technology-focused

company.   Eco Science's core services span business location, localized communications between consumers and business operators, social networking, educational content, e-commerce, product commercialization, and delivery.  As of January 31, 2017, the Company had six employees, inclusive of four part time service providers. In addition, the Company has retained twenty-three independent consultants.

**Defendants**

24.    Defendant J. Taylor is and has been since December 2015, Eco Science's CEO and President.  J. Taylor also is and has been since January 2016, the Secretary and a director of the Company.  Defendant J. Taylor is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant J. Taylor knowingly, recklessly, or with gross negligence: (i) caused or allowed Eco Science to engage in a pump-and-dump scheme and sham transactions designed to enrich himself and defendant Giguiere at the expense of the Company; and (ii) made improper statements in the Company's press releases and public filings concerning the Company's operations.   Eco Science paid defendant J. Taylor the following compensation as an executive:

| Year | Salary | Stock Awards | Total |
|------|--------|--------------|-------|
| 2017 | $115,000 | $8,190,000 | $8,305,000 |

Defendant J. Taylor is a citizen of Hawaii.

25.     Defendant D. Taylor is and has been since December 2015, Eco Science's CFO.  D. Taylor also is and has been since January 2016, the Treasurer and a director of the Company.  Defendant D. Taylor is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant D. Taylor knowingly, recklessly, or with gross negligence: (i) caused  or allowed Eco Science to engage in a pump-and-dump scheme and sham transactions designed to enrich himself and defendant Giguiere at the expense of the Company; and (ii) made improper statements in the Company's press releases and public filings concerning the Company's operations. Eco Science paid defendant D. Taylor the following compensation as an executive:

| Year | Salary | Stock Awards | Total |
|------|--------|--------------|-------|
| 2017 | $105,000 | $8,190,000 | $8,295,000 |

Defendant D. Taylor is a citizen of Hawaii.

26.     Defendant L. John Lewis ("Lewis") is and has been since June 2017, an Eco Science director.  Defendant Lewis also is and has been since June 2017, the CEO of Ga Du Corporation.  Defendant Lewis aided and abetted defendants J. Taylor and D. Taylor in the breach of their fiduciary duties to the Company. Defendant Lewis is a citizen of Utah.

27.     Defendant S. Randall Oveson ("Oveson") is and has been since June

2017, an Eco Science director.  Defendant Oveson also is and has been since June 2017, Ga Du Corporation's Chief Operating Officer ("COO").  Defendant Oveson aided and abetted defendants J. Taylor and D. Taylor in the breach of their fiduciary duties to the Company.  Defendant Oveson is a citizen of Utah.

28.     Defendant Giguiere is the Chairman, CEO, Secretary, and President of SDOI and has been since at least January 2015.  Defendant Giguiere founded SDOI in December 2014.  Defendant Giguiere was also the Managing Member of Phenix from at least January 2017 to at least December 2017.  Defendant Giguiere is named as a defendant in a related securities class action complaint that alleges he violated section 10(b) of the Exchange Act.  Defendant Giguiere aided and abetted defendants J. Taylor and D. Taylor in the breach of their fiduciary duties to the Company.  Defendant Giguiere is a citizen of California.

29.     The defendants identified in ¶¶24-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24-27 are referred to herein as the "Director Defendants."  Collectively, the defendants identified in ¶¶24-28 are referred to herein as the "Individual Defendants."

## DUTIES OF THE OFFICER DEFENDANTS AND DIRECTOR DEFENDANTS

**Fiduciary Duties**

30.     By reason of their positions as officers and directors of the Company, each of the Officer Defendants and Director Defendants owed and owe Eco

Science and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Eco Science in a fair, just, honest, and equitable manner.  The Officer Defendants and Director Defendants were and are required to act in furtherance of the best interests of Eco Science and not in furtherance of their personal interest or benefit.

31.    To discharge their duties, the officers and directors of Eco Science were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Eco Science were required to, among other things:

a)  properly and accurately guide the Company's stockholders and the public when speaking about Eco Science's financial condition at any given time, including making accurate statements about the Company's operations and financial well-being;

b)  conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) remain informed as to how Eco Science conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

d) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct; and

e) refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors.

**Control, Access, and Authority**

32. The Officer Defendants and Director Defendants, because of their positions of control and authority as controlling stockholders, directors, and/or officers of Eco Science, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

33. Because of their advisory, executive, managerial, and directorial positions with Eco Science, each of the Officer Defendants and Director

Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of Eco Science, including information regarding the several factors negatively impacting the Company's performance.

34.     At all times relevant hereto, each of the Officer Defendants and Director Defendants was the agent of each of the other Officer Defendants and Director Defendants and of Eco Science, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

35.     Each of the Officer Defendants and Director Defendants, by virtue of his position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Officer Defendants and Director Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Eco Science, the absence of good faith on their part, and a reckless disregard for their duties to the Company and the Officer Defendants and Director Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company. The conduct of the Officer Defendants and Director

Defendants who were also officers and/or directors of the Company have been ratified by the remaining Officer Defendants and Director Defendants who collectively comprised all of Eco Science's Board of Directors (the "Board").

36.   The Officer Defendants and Director Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements, improper practices that wasted the Company's assets, and caused Eco Science to incur substantial damage.

37.   The Officer Defendants and Director Defendants, because of their positions of control and authority as officers and/or directors of Eco Science, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Officer Defendants and Director Defendants also failed to prevent the other Officer Defendants and Director Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Eco Science has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of

their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Eco Science's business, operations, and prospects that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Eco Science, regarding the Officer Defendants' management of Eco Science's operations; and (iii) enhance the Officer Defendants' and Director Defendants' positions at Eco Science and the profits, power, and prestige that these defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to engage in the wrongdoing described herein and to issue improper statements.

41.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to

disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, aiding and abetting, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the wrongs complained of herein.  Because the actions described herein occurred under the authority of the Board, each of the Officer Defendants and Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND OF DEFENDANTS J. TAYLOR AND D. TAYLOR'S CONTROL OF THE COMPANY

44.   Eco Science purportedly provides software-based products targeting consumers within the health and wellness industry, particularly focusing on holistic

health, wellness, and alternative medicines, including cannabis. According to Eco Science's most recent Annual Report on Form 10-K, filed with the SEC on May 1, 2017, the Company builds "both consumer and enterprise technology, consumer package goods, investing in Research & Development and advertising to consumer and professional traffic for both our apps and web properties."

45.    Defendants J. Taylor and D. Taylor together purchased approximately 57.5% of the Company's issued and outstanding common stock on December 15, 2015, worth around $61,000,[3] from the former majority stockholder in a private transaction.  In a Current Report on Form 8-K, filed  with the SEC on December 24, 2015, it was announced that defendant J. Taylor would be taking the position of CEO and defendant D. Taylor as CFO.   The Form 8-K revealed that, while defendants J. Taylor and D. Taylor would be overseeing the development of technology and content for Eco Science, they had no experience in the health and wellness industry or consumer software development.  Defendants J. Taylor and D. Taylor also installed themselves as the sole directors of the Company.  The Form 8-K stated:

**ITEM 5.02 DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; APPOINTMENT OF CERTAIN OFFICERS**

---

[3] Calculation based on the Company's Current Report on Form 8-K filed with the SEC on January 12, 2016, which stated that the Company had almost 26.9 million total outstanding and issued shares.  The market price for the stock at the time of defendants J. Taylor and D. Taylor's transaction was $0.004 per share.

On December 17, 2015, Michael Borkowski resigned as President and Chief Executive Officer of the Company, effective December 17, 2015. Additionally, Mr. Borkowski resigned his position as Director of the Company effective December 17, 2015. Mr. Borkowski resigned for no other reason than to pursue other opportunities that will preclude him from dedicating time to the Company necessary for the day-to-day running of the Company. Mr. Borkowski will help the new Officers with the transition.

On December 10, 2015, Mark Dilley resigned as a Director of the Company, for no other reasons than personal reasons.

Effective December 17, 2015, Mr. Jeffery Taylor was appointed to serve as Chief Executive Officer of the Company and Mr. Don Lee Taylor was appointed to serve as Chief Financial Officer of the Company.

<u>Mr. Jeffery Taylor</u>

As CEO, Mr. Jeffrey Taylor will oversee the company's strategy, technology roadmap, and consumer community content development programs; Mr. Taylor is a recipient of the Army Commendation Medal from the United States Army during service of operation Uphold Democracy; he served in the United States Army for 10 Years and focused on supply chain management technologies with an emphasis on logistics and distribution of specialty materials. Mr. Taylor was discharged with a Medical Discharge; Mr. Taylor has been a real estate entrepreneur and holds a real estate license in the State of Hawaii from 2005 to present. In 2003, Mr. Taylor received his Microsoft technology certification from the Veterans Association during rehabilitation process from being injured in the military. As part of his passion for open water scuba and snorkeling, he launched Liquid Marlin LLC, and works with the Make A Wish Foundation on Maui as one of its designated snorkel instructors.

<u>Mr. Don Lee Taylor</u>

As CFO, Don Taylor will oversee the company's financial governance; business community content development program, and business partnerships. Mr. Taylor holds a real estate license in the State of Hawaii from 2001 to Present; and has been active in the

Hawaii real estate and real estate financing community. Mr. Taylor currently holds the title of Broker in Charge of Maui Realty Co., Inc. Mr. Taylor holds a BS in Finance with an emphasis in Financial Management from the California State University in Long Beach.

## DEFENDANT GIGUIERE'S PREVIOUS PUMP-AND-DUMP SCHEME

46.     As described in more detail herein, central to the Individual Defendants' operation of Eco Science as part of a pump-and-dump scheme is the Company's relationship with defendant Giguiere.  Defendant Giguiere has engaged in similar schemes in the past.

47.     Eventure Interactive, Inc. ("Eventure") is a Nevada corporation with a similar trajectory as Eco Science, eventually resulting in decimation of the company's equity value.  Originally incorporated as a GPS tracking unit distribution business in 2010, the company became Live Event Media, Inc. ("Live Event") in November 2012, transitioning to a social communications business.  In connection with this transition, Live Event purchased certain "social communication assets."  These "assets" consisted of a software platform with millions of lines of code authored in various languages from defendant Giguiere and fellow investor Alan Johnson ("Johnson").  The purchase was announced in Live Event's Current Report on Form 8-K filed with the SEC on November 28, 2012.  Under this so-called "Asset Purchase Agreement," defendant Giguiere and Johnson were issued an aggregate of approximately 14.6 million shares of Live Event restricted common stock, with an estimated value of $7.29 million.  The

November 28, 2012 Form 8-K stated:

> On November 21, 2012 we entered into and closed an Asset Purchase Agreement (the "Asset Purchase Agreement") with Local Event Media, Inc., our wholly owned Nevada subsidiary, and Gannon Giguiere and Alan Johnson (collectively the "Sellers") under which the Sellers sold to us assets (the "Assets") which will enable us to engage in the social media business. ***The Assets consist of a software platform with millions of lines of code authored in various languages including, but not limited to HTML, Java, Python and SQL.*** The software platform operates at multiple levels from a back-end, middle-ware and front-end, all which have been compiled into a fully functional web based application. The software has been and will continue to be written locally by various software developers, committed to a storage vault and then compiled into a functional application, which is then served on rented servers or what is currently referred to as a cloud server farm.

48.     As part of its Asset Purchase Agreement, Live Event also appointed defendant Giguiere as Chairman, CEO, and Secretary and appointed Johnson as President and a director.  The name of the company was then changed to Eventure in February 2013.  The material agreement and code technology associated with the Asset Purchase Agreement, however, provided no additional revenue to Eventure.

49.     With defendant Giguiere at Eventure's helm, he and his fellow investor, Johnson, pumped up the value of the stock by promoting social invitation and sharing "apps" created from defendant Giguiere's supposed code technology in its press releases and public filings.  They then dumped their personal stock prior to its precipitous decline when Eventure began making numerous material

agreements with enigmatic entities with potential conflicts of interest with

defendant Giguiere, undisclosed to Eventure's investors.   In those material

agreements, Eventure sold millions of the Company's shares to these entities and

increasing its capitalization by issuing more than a billion shares:

| Eventure Registrant's Common Stock $0.001 par value, Outstanding as of | |
|---|---|
| (Pre-Giguiere) August 17, 2012 | (Giguiere) November 23, 2015 |
| 10,400,000 | 1,101,066,432 |

50.    For example, in December 2015, Eventure entered into an Investment

Agreement and a Registration Rights Agreement with N600PG, LLC ("N600PG"),

a company with defendant Giguiere as a managing member, to establish a source

of funding.  Based on Eventure's Current Report on Form 8-K filed with SEC on

January 8, 2016, N600PG agreed to purchase $10 million worth of stock at 80% of

Eventure's market price at the time.   Under defendant Giguiere, Eventure also

entered several material agreements with various entities, issuing over a billion

shares from 2013 to 2015.

51.    The damage defendant Giguiere caused Eventure has been irreparable.

Ultimately, the company's equity value plummeted from $3.40 per share on

January 2, 2014 to less than $0.14 per share by December 31, 2014, a loss of $3.26

a share.  This represented a market capitalization loss of $60 million, or 94% of its

value.  Since this staggering decline, Eventure's shares have remained worthless at

$0.0001 a share.



## THE INDIVIDUAL DEFENDANTS' PUMP-AND-DUMP SCHEME

## Eco Science Purchases Worthless Proprietary Technology from SDOI

52.    SDOI reports to be a development stage company intended to develop marketing and e-commerce solutions in the business-to-consumer and business-to-business markets.  Defendant Giguiere leads SDOI as its founder, Chairman, CEO, Secretary, and President.   SDOI's corporate structure and operations mirror defendant Giguiere's Eventure scheme, wherein SDOI issued defendant Giguiere millions in equity through related transactions.  For example, per SDOI's Form S-1 Registration Statement disclosures, defendant Giguiere was issued the majority of the stock with 100% of the outstanding Preferred and 70.64% of the outstanding Common Stock.   In December 2014, SDOI entered into an Asset Purchase Agreement with defendant Giguiere that included a software platform which

allegedly contained millions of lines of codes.

53.    In January 2015, defendant Giguiere attempted to take SDOI public and filed a Form S-1 Registration Statement with the SEC on January 26, 2015, on a self-underwritten, best efforts basis.   With language eerily similar to that of Eventure's doomed Asset Purchase Agreement, the January 26, 2015 Form S-1 stated:

> On December 19, 2014, we entered into an Asset Purchase Agreement with Gannon Giguiere, our President and CEO, **which includes a software platform with millions of lines of code authored in various languages including, but not limited to, HTML, Java, Python, and SQL.** The software platform operates at multiple levels from a back-end, middle-ware and front-end, all, which have been compiled into a fully functional web based application. The software has been, and will continue to be, written locally by various software developers, committed to a storage vault, and then compiled into a functional application, which is then served on rented servers, or what is currently referred to as a cloud server farm.
>
> The software platform provides for diversified revenue streams in the form of licensing revenue, transactional revenue and services revenue. Licensing revenue is generated from deployment of the specialized Magento, OsCommerce and internally developed e-commerce shopping cart and catalog management platforms. Transactional revenue is generated from the commission fees associated with the automated onboarding of large scale catalogs onto selling networks such as Amazon, eBay, Ratuken and leading comparison shopping portals. Services revenue is generated from the SEO, SEM, SMO and Affiliate Program management capabilities that the software platform has been developed to support. Notable firms that operate similar platforms include the following:
>
>> Square Space – www.squarespace.com
>> Wix - http://www.wix.com Weebly - http://www.weebly.com
>> Gorilla Group - http://www.gorillagroup.com Corra -

> http://corra.com
> Spiegel Design Group - https://www.sdg.la Channel Advisors –
> www.channeladvisors.com Expandly –
> http://www.expandly.com
> Mercent - http://www.mercent.com

The Company's assets will also include the multiple consulting relationships in which our President and CEO, Gannon Giguiere, is currently engaged, which span his consulting work for clients in eCommerce development, search engine optimization, online media planning and buying, as well as product placement for commission based selling.

\*     \*     \*

The software platform that has been acquired in preferred stock and valued at the par value of the preferred stock which results in a value of Five Thousand Dollars ($5,000).

\*     \*     \*

***The software platform provides for diversified revenue streams in the form of licensing revenue, transactional revenue and services revenue.*** Licensing revenue is generated from deployment of the specialized Magento, OsCommerce and internally developed e-commerce shopping cart and catalog management platforms. Transactional revenue is generated from the commission fees associated with the automated onboarding of large scale catalogs onto selling networks such as Amazon, eBay, Ratuken and leading comparison shopping portals. Services revenue is generated from the SEO, SEM, SMO and Affiliate Program management capabilities that the software platform has been developed to support.

The software platform has not begun being amortized because it has not been placed in service yet, but upon deployment into service it will be amortized over a three-year period.

The software is tested annually for impairment and is not deemed impaired at this time.

54.   Upon receiving continued resistance from the SEC,[4] defendant Giguiere failed to complete the initial public offering and then turned his attention and efforts to Eco Science to engage in a similar scheme, but this time behind the scenes.  On January 1, 2016, shortly after defendants J. Taylor and D. Taylor's appointment and acquisition of the majority of the Company's shares, the Company agreed to acquire a reportedly "proprietary" messaging and customer relationship management software platform from SDOI under an Asset Purchase Agreement. The Asset Purchase Agreement mirrored defendant Giguiere's previous scheme with Eventure and SDOI.  The Individual Defendants also agreed to a Technology Licensing and Marketing Support Agreement with SDOI that would "result in the development, licensing and management of on-going technology solutions and marketing campaigns for ESSI's initiatives."

55.   As consideration for SDOI's marketing "services," the Company agreed to pay SDOI 1,000 Series A preferred shares, together with S-8 shares[5] to cover monthly service shares.  The Company also announced that it would issue additional common stock with registration rights in consideration for the Asset

_____

[4] Even after six amendments to SDOI's initial Form S-1 Registration Statement, the SEC stated in a letter to defendant Giguiere, dated September 9, 2015, that it "would likely recommend that the Commission deny your request."

[5] Often used by over-the-counter (OTC) issuers as compensation, S-8 shares are provided to employees and consultants who are not an affiliate that directly or indirectly controls the issuer.  The shares become immediately effective upon

Purchase Agreement.

56.    Also in January 2016, the Company entered into an agreement with SDOI for the purchase of a communications software platform, including custom developed libraries.  The Company's 2015 Annual Report on Form 10-K filed with the SEC on May 17, 2016 (the "2015 Form 10-K") asserted that the purchase of the libraries from SDOI was made in furtherance of creating the software platform the Company was developing.  As consideration, Eco Science issued SDOI 500,000 shares of common stock, recording the fair market value of $3,500 on the date of the agreement as intangible assets on the Company's balance sheet.

57.    This software platform touted by defendants J. Taylor, D. Taylor, and Giguiere was allegedly used in the creation of the Company's Fitrix and Herbo mobile apps.  In the 2015 Form 10-K, signed by defendants J. Taylor and D. Taylor, it touted the launch of "The Pursuit of Fine Herb Original Content" on its Eco Science and Herbo YouTube channels, along with its Herbo and Fitrix mobile apps.  The roll out of these products were allegedly part of the Company's "monetization strategy" that would "generate revenue through paid advertisements" and "sales of consumer packaged goods targeting general health and wellness and alternative medicines," without providing specifics.

58.    Promoting the supposed value of these products, the 2015 Form 10-K

filing a Form S-8 short-form registration statement with the SEC.

stated that the Herbo app provides "a database of over 14,000 alternative medicine locations and delivery services, doctors who provide evaluations, and local shops that sell relevant product."  The 2015 Form 10-K claimed that the Herbo app was designed to help "consumers find products and services that support the intake of alternative medicines for a more naturopathic way of living."  Of the Fitrix app, the 2015 Form 10-K stated that it is "a powerful and flexible companion which helps users keep track of your day to day fitness routines, dietary habits and alternative medicine intake."

59.  The supposed software platform used in the apps bears marked similarities to the "codes" marketed by defendant Giguiere's previous enterprises, Eventure and SDOI.  As later reported by *Seeking Alpha*, discussed below, Fitrix and Herbo are rudimentary and largely worthless due to a lack of functionality or advertising revenue.

60.  Instead of providing the marketing support for the Company's products, as required by the Technology Licensing and Marketing Support Agreement, SDOI merely paid the website *TheMoneyStreet.com* to promote Eco Science's stock on the website and YouTube. For example, in an undated posting on its website entitled "Is This the Next Big Stock for 2016?," *TheMoneyStreet.com* referred to Eco Science as a potential player in the cannabis industry, following Amazon's business model.  The posting further averred that

Eco Science was leveraging its supposed product line to reap the benefits from a

burgeoning $10 billion industry.  The posting stated:

> Eco Science Solutions, Inc. (OTC: ESSI) has an interesting business
> model. It's approaching the industry as a technology company that is
> building and delivering e-commerce infrastructure services that
> connect consumers with cannabis businesses (B2C), and cannabis
> businesses with other cannabis businesses (B2B).
>
> Their timing to the market couldn't be better, and if they can execute,
> they stand to make a big splash.
>
> *     *     *
>
> Eco Science seems to be taking a page out of Amazon.com's playbook
> to focus on developing the ecommerce technology infrastructure that
> creates marketplace opportunities among consumers and sellers where
> businesses can grow their brands and business offerings.
>
> *     *     *
>
> And following Amazon.com, Eco Science will focus on perfecting its
> marketplace on select products, and then continue to rollout new
> product categories as its sees traction with consumers where it can
> then recruit more manufacturers and distributors to address consumer
> trends.
>
> The Company has stated that it will initially focus on helping
> consumers find and purchase cannabis ancillary products easily and
> conveniently.
>
> *     *     *
>
> It's eerily similar to how Amazon started out. It initially launched
> focused on selling books. It wasn't a sexy product line, and one that
> was probably not too competitive at the time. This allowed Amazon
> to perfect is e-commerce model while building direct relationships
> with consumers that eventually led to it owning the coveted "the last
> mile" because of its delivery of products to the doorstep of
> consumers.
>
> As Amazon started out just selling books, owning the last mile has

allowed them to continue to expand their product offerings, and to grow vertically to further allow them to capture more market share.

***If you take a look at Eco Science's business model, one could see the similarities to Amazon's strategy.***

Eco Science is developing technology infrastructure to create a marketplace. The marketplace will connect consumers with products that are carried by sellers. The products offered are not considered "sexy" products. This affords for the likelihood of less competition, which allows the company time to optimize its technology and business model while building long-term consumer relationships.

Eco Science will primarily connect consumers with local smoke shops and local businesses. This allows it to provide consumers with multiple options to get their products – from their own branded delivery service (Uber), to in-store pick-up, to quick and convenient mail delivery.

Simultaneously, Eco Science can perfect its local logistics model without having the delivery service be its core business model. Localization also allows Eco Science to learn the ins-and-outs of intrastate commerce vs. interstate commerce, which will be valuable as it expands its product offerings and footprint in the marketplace.

61.    The 2015 Form 10-K noted that defendant Giguiere's company SDOI was issued a total of 1.2 million shares of common stock as part of its agreement to advertise and market these products.  This payment was in addition to 500,000 shares of common stock issued to SDOI as part of the supposed "Asset Purchase Agreement" with the company.

62.    In Eco Science's Quarterly Report on Form 10-Q filed with the SEC on June 20, 2016, it announced an amendment of the Company's agreements with SDOI, noting stock payments to the Giguiere-run company for alleged "advertising

services" rendered.  The Form 10-Q stated that the Company issued approximately 1.3 million shares of common stock as part of its consulting agreement with SDOI on May 9, 2016.  The Form 10-Q further outlined an amendment to the SDOI Technology Licensing and Marketing Support Agreement which included an increase in S-8 shares to be issued to SDOI as of June 1, 2016, stating:

> On June 1, 2016, the Company entered into a further amendment to the Technology Licensing and Marketing Agreement between SDOI and the Company. Under the Amendment: (1) SDOI will not be issued Series A Preferred Stock initially equal to the current total authorized common shares outstanding of 650,000,000; (2) Invoices for advertising services will be billed separately from the $35,000 standard monthly fee and will have the same terms as the monthly fee; i.e., the amount invoiced will be paid via the issuance of S-8 shares of ESSI Common Stock (issued at a 30% discount to the market VWAP on the date of payment due or a share price of $0.01, whichever is greater).

63.    In Eco Science's following Quarterly Report on Form 10-Q filed with the SEC on September 19, 2016, it reported that for "advertising services" rendered by SDOI the Company allocated another 7.5 million shares for issuance under its agreements with SDOI, but remained unissued.

64.    On December 2, 2016, Eco Science filed its Quarterly Report on Form 10-Q with the SEC. The Form 10-Q stated that since signing the Technology 10-Licensing and Marketing Support Agreement with SDOI, the Company had received invoices for SDOI's advertising services, totaling over $1.5 million.  Also, under a section entitled "Plan of Operation," the Form 10-Q made claims that the

Company was financing ongoing licensing support and maintenance fees by providing stock at a discounted price. In particular, the Form 10-Q stated:

> During the nine months ended October 31, 2016 the Company received invoices for advertising services from SDOI totaling $1,271,274 and further received invoices for monthly project and planned technical development/maintenance, production and staging server administration, ongoing marketing services and monthly advertising management services totaling a cumulative $322,000.
>
> *   *   *
>
> We have recently changed the focus of our business to operate in the eco-friendly technology sector using social media sites and offering apps to generate advertising revenues and download fees. The Company's need for ongoing capital by way of loans, sale of equity and/or convertible notes is expected to continue during the current fiscal year until we can establish revenues from operations. We are presently financing ongoing licensing support and maintenance fees associated with our newly commenced business focus by the issuance of shares of common stock for services at a discount to our market price.

65.    Overall, while the fraudulent articles pumped up the value of the Company's stock to over $4.50 per share in January 2017, defendants J. Taylor and D. Taylor were unloading millions of shares of Eco Science stock to defendant Giguiere's SDOI. The Form 10-Q claimed this stock payment was reimbursement for defendant Giguiere's purported tendered services. Pursuant to the Technology Licensing and Marketing Support Agreement dated January 1, 2016, and various amendments dated April 25, 2016, June 1, 2016, and October 1, 2016, Eco Science owed SDOI $1,920,424 as of January 17, 2017.

66.    Also on January 1, 2016, the Company disclosed it had entered into a

Cancellation and Release Agreement with SDOI.   Under this agreement, Eco

Science and SDOI mutually agreed to cancel the outstanding invoices in exchange

for four million shares.  These invoices, converted into Eco Science shares, would

translate to millions lining the pockets of defendant Giguiere if later approved to be

sold:

| SDOI Invoice Conversion to ESSI Shares | | | | | |
|---|---|---|---|---|---|
| *(Per the Cancellation of the Agreement 01/17/17*) | | | | | |
| Invoice Date | Amount of Invoice | VWAP | Discount | Conversion Price | Total Converted Shares |
| 1/1/2016 | $73,510.00 | $0.00 | $0.30 | $0.01 | $7,351,000.00 |
| 2/1/2016 | $76,225.00 | $0.24 | $0.30 | $0.17 | $4,537,202.00 |
| 3/1/2015 | $76,556.00 | $0.41 | $0.30 | $0.29 | $266,746.00 |
| 4/1/2016 | $124,589.00 | $0.37 | $0.30 | $0.26 | $485,160.00 |
| 5/1/2016 | $126,956.00 | $0.27 | $0.30 | $0.19 | $671,725.00 |
| 6/1/2016 | $125,000.00 | $0.26 | $0.30 | $0.18 | $694,444.00 |
| 7/1/2016 | $150,000.00 | $0.24 | $0.30 | $0.17 | $877,706.00 |
| 8/1/2016 | $150,000.00 | $0.27 | $0.30 | $0.19 | $789,058.00 |
| 9/1/2016 | $200,000.00 | $0.68 | $0.30 | $0.47 | $421,674.00 |
| 10/1/2016 | $226,157.00 | $1.61 | $0.30 | $1.13 | $200,672.00 |
| 11/1/2016 | $237,464.85 | $1.96 | $0.30 | $1.37 | $173,079.00 |
| 12/1/2016 | $227,966.25 | $1.76 | $0.30 | $1.23 | $185,038.00 |
| **TOTAL** | **$1,794,424.00** | | | | **$16,653,504.00** |
| Monthly Invoice Date | Amount of Invoice | VWAP | Discount | Conversion Price | Total Converted Shares |
| 10/1/2016 | $42,000.00 | $1.61 | $0.30 | $1.13 | $37,267.00 |
| 11/1/2016 | $42,000.00 | $1.96 | $0.30 | $1.37 | $30,612.00 |
| 12/1/2016 | $42,000.00 | $1.76 | $0.30 | $1.23 | $23,864.00 |
| **TOTAL** | **$126,000.00** | | | | **$91,743.00** |
| **TOTAL OUTSTANDING BALANCE: $1,920,424.00** | | | | | |
| **TOTAL SHARES UNDER THE AGREEMENTS (IF CONVERTED): 16,745,247** | | | | | |

67.    In summary, SDOI invoiced Eco Science millions of dollars in fees

and stock for its "services."  Instead of advertising and marketing the Company's

products, as per the marketing agreements the parties signed, SDOI was pumping up the value of the Company's stock through market research websites.  SDOI's activities, publishing conflated research reports in order to later sell the stock at an artificially inflated price, are classic elements of a pump-and-dump scheme.

**Defendant Giguiere Acquires Additional Company Stock Through Phenix**

68.     On January 26, 2017, Eco Science filed a Current Report on Form 8-K with the SEC, attaching the Company's Equity Purchase Agreement with Phenix. Phenix is an entity with defendant Giguiere as its Managing Member.  The Equity Purchase Agreement drew a striking resemblance to Eventure's toxic financing deal with N600PG under the direction of defendant Giguiere.  The Form 8-K stated that Eco Science would have the option to sell Phenix ten million shares of the Company's common stock at a discounted price "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered."

69.     By providing defendant Giguiere with access to additional Eco Science shares, the Individual Defendants furthered their pump-and-dump scheme. With the Company's stock price still artificially inflated, the Individual Defendants ensured that defendant Giguiere could continue to use the Company as his personal piggy bank by allowing him to purchase additional shares at a steep discount. Defendant Giguiere would then dump those shares for a profit at the inflated price.

Continuing the process over the course of several days, defendant Giguiere could then buy additional Eco Science shares at increasingly discounted prices as share prices deteriorate in response to the dumping of stock.

70.    The Company sought to register this issuance via a Form S-1 Registration Statement filed with the SEC on January 27, 2017.   This toxic financing deal masked a transfer of ten million shares of stock to defendant Giguiere below the market price to allow him to cash in on the Company's inflated stock price once the issuance had been registered.   The Form S-1 also sought to register for resale four million of the Company's shares issued to SDOI, another entity operated by defendant Giguiere, as part of "invoices and fees totaling $1,920,424" for SDOI's supposed advertising services.[6]

**Eco Science's Acquisition of Ga-Du Bank**

71.    While the Individual Defendants awaited SEC approval of the Form S-1 Registration Statement that would allow defendant Giguiere to cash in on his scheme, the Company's stock price began to wane.   In the Company's 2016 Annual Report on Form 10-K filed with the SEC on May 1, 2017 (the "2016 Form 10-K"), it began to prime the pump on the prospective sham transaction with Ga-Du Bank,

---

[6] The Company's Form 10-Q filed on December 20, 2017, for the quarterly period ended October 31, 2017, states that the invoices received for advertising services from SDOI as well as service fees invoiced for project and planned technical development/maintenance, production and staging server administration is $2,061,506 for the fiscal year ended January 31, 2017.

promising "unique investment and acquisition opportunities that are both synergistic and accretive to the Company."   Through this transaction, the Individual Defendants attempted to keep the stock price afloat at artificially high prices until the SEC approved the issuance of fourteen million Eco Science shares to defendant Giguiere.  The Form 10-K stated:

> The following is to provide a road-map for how the Company intends to prepare for and generate revenues, along with the costs associated to do so. Eco Science Solutions' core Initiatives are centered on five main areas: 1) continued consumer and enterprise technology investment, 2) continued product development through Scientific Research and Development; 3) inventory build for distribution, and *4) strategic acquisitions that provide an accelerated time-frame to secure market share*; 5) development of Sales, Customer and Finance personnel depth to support accelerated revenue growth.
>
> \*   \*   \*
>
> *Strategic acquisitions – Due to various hyper-growth trends in segments of the holistic health and wellness category, Eco Science Solutions believes that it will be presented with unique investment and acquisition opportunities that are both synergistic and accretive to the Company.* The Management Team has already identified several candidates. The Company has not budgeted an exact dollar amount for investment purposes in Strategic acquisitions over the next 12-month period.

72.    On May 5, 2017, Eco Science issued a press release entitled "Eco Science Solutions, Inc.   Signs Letter of Intent to Acquire Specialty Banking Operation."   In the press release, the Company announced that it had signed a Letter of Intent to purchase Ga-Du Bank to provide financial servicing to growers, suppliers, distributors, retailers, and consumers in the cannabis industry.  The press

release stated that Ga-Du Bank received its charter through the Central Bank of the Southern Cherokee Nation and The Red Fire People ("SCNRFP") and that Ga-Du Bank had received preliminary commitments to deposit sums between $300 million to $600 million within the first 60 to 180 days following the acquisition. However, there are no records or official sources corroborating the existence of the Ga-Du Bank, which an article published by *Seeking Alpha* would also later reveal. The press release asserted:

> MAUI, HI--(Marketwired - May 5, 2017) - Eco Science Solutions, Inc. (OTCQB: ESSI), an eco-technology Company providing solutions to the multi-billion-dollar health, wellness and alternative medicine industry, today announced that it has signed a Letter of Intent with Ga Du Bank, Inc. for the purpose of acquiring full ownership of the Bank in a stock and cash transaction.
>
> Upon the closing of the transaction, ESSI will operate the Bank as a wholly-owned subsidiary of Eco Science Solutions, Inc. ESSI will own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry.
>
> Additionally, ***the Bank's principals have engaged with prospects in the marketplace whom have made expressions of interest, along with preliminary commitments to deposit sums between Three-Hundred and Six-Hundred Million Dollars ($300,000,000 and $600,000,000).*** These amounts are currently being projected to be deposited within the first sixty to one-hundred-eighty days following the acquisition of the Bank by ESSI.
>
> "All parties involved are enthusiastic about the Bank's potential to financially serve the cannabis marketplace. Current business owners working in medical marijuana are doing a tremendous job, but are truly in need of formal banking services so they can soundly manage their business finances," stated John Lewis, who is both the current president of the Bank and a Governor of the Central Bank of

SCNRFP. Mr. Lewis continued with, "By combining Ga Du Bank with Eco Science Solutions, we see how our synergies will create an important financial institution to serve a category that is in need of a fully integrated vertical product suite."

"Our entire team is thrilled by the prospect of the acquisition of the Ga Du Bank by ESSI," said Andy Tucker, Senior Advisor to of Ga Du Bank. Mr. Tucker continued, "We believe that in joining forces with the ESSI team, we can deliver a comprehensive suite of financial products that addresses the current needs of currently what is a cash-driven industry, allowing ESSI to become a break-out leader for the sector."

*"It has been our vision from day one that, in order to fully service the cannabis industry and execute on our business plan, we needed to be creative in securing and offering a banking platform that further differentiates us from everyone in our category," stated Jeff Taylor, Chief Executive Officer of Eco Science Solutions, Inc.* Mr. Taylor continued, "The deal with Ga Du Bank is a game-changer for not only ESSI, but everyone in the cannabis industry. This new division of our Company will put us years ahead of our goal to create a full-service marketplace among growers, suppliers, distributors, retailers and consumers."

73.     In summary, the Individual Defendants furthered a classic pump-and-dump scheme through various sham agreements designed to enrich themselves at expense of the Company.  To accomplish this scheme, defendants J. Taylor and D. Taylor directed and approved marketing and asset acquisition agreements with the defendant Giguiere-run SDOI.  Defendant Giguiere, through his company SDOI, marketed Eco Science's stock alleging that the Company was the next Amazon of the cannabis industry without discussing the Company's products.  The Company's products, including mobile apps and online content, did not warrant the claims

made in SDOI's marketing as they were rudimentary and produced no revenue for Eco Science.   Defendant Giguiere still invoiced the Company millions of dollars for this "service," and in the end received millions in stock awards as supposed compensation.   Defendants J. Taylor and D. Taylor also arranged for defendant Giguiere to acquire millions of Eco Science shares at a steep discount through an agreement with his financing company, Phenix. This transaction disguised a blatant transfer of more Eco Science shares allowing defendant Giguiere to capitalize on the inflated value of the stock.   The Individual Defendants then attempted to register defendant Giguiere's millions of Company stock he had acquired through these arrangements.   In the ensuing downturn as they awaited SEC approval, the Individual Defendants conspired to keep the Company's stock value afloat with another sham transaction, this time with the so-called Ga-Du Bank.   The SEC found this transaction questionable and suspended trading. Since the lifting of the SEC suspension, the Individual Defendants have continued to tout the possibility of a Ga-Du Bank acquisition to keep the stock afloat, to the detriment of the Company and its investors.

## IMPROPER STATEMENTS

74.   During this period, while engaged in various arrangements with defendant Giguiere, the Individual Defendants made repeated improper statements about the Company's business, operations, and prospects.   In truth, the Individual

Defendants were engaged in a pump-and-dump scheme designed to manipulate the true value of the Company's stock and enrich themselves at expense of the Company's reputation and financial wellbeing.

75.    In the January 12, 2016 Form 8-K, the Company announced it had acquired a "proprietary messaging and customer relationship management software platform" from SDOI as part of an "Asset Purchase Agreement."  This transaction was smoke and mirrors to disguise the transfer of Company shares to defendant Giguiere as part of the Individual Defendants' pump-and-dump scheme.  Although defendants J. Taylor, D. Taylor, and Giguiere claimed that the software platform was used to develop the Fitrix and Herbo apps, these products were effectively rudimentary and produced no revenue.  In addition, the Form 8-K announced that the Company had signed a "technology licensing and marketing support agreement."   In reality, Eco Science, under the direction and supervision of defendants J. Taylor and D. Taylor, compensated defendant Giguiere through SDOI for pumping up the value of the Company's stock, instead of the worthless products that the Company touted.

76.    On February 26, 2016, Eco Science issued a press release announcing in the section entitled "About Eco Science Solutions, Inc.," that the Company "develops solutions that empower cannabis enthusiasts in their pursuit and enjoyment of their cannabis lifestyle," including through its Herbo app.

77.    In the 2015 Form 10-K filed with the SEC on May 17, 2016, Eco Science extoled the revenue potential and sophistication of the Fitrix and Herbo apps.  The 2015 Form 10-K claimed that the Herbo app contained a "database of over 14,000 alternative medicine locations and delivery services, doctors who provide evaluations, and local shops that sell relevant product."  Following the alleged "launch" of this product, the Company asserted that defendants J. Taylor and D. Taylor had introduced Fitrix, "a powerful and flexible companion which helps users keep track of your day to day fitness routines, dietary habits and alternative medicine intake."  Without much detail, the 2015 Form 10-K further averred that the Company would "generate revenue through paid advertisements form business seeking exposure to users [of] the Herbo services" and "sales of consumer packaged goods targeting general health and wellness and alternative medicines."  As discussed further in this complaint, these products were largely worthless and provided no revenue to the Company.

78.    Defendants J. Taylor and D. Taylor signed the 2015 Form 10-K.  The public filing contained certifications by defendants J. Taylor and D. Taylor pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the 2015 Form 10-K contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with

respect to the period covered by the 2015 Form 10-K.

79.    On June 20, 2016, the Company filed its Quarterly Report on Form 10-Q for the fiscal quarter ending April 30, 2016 with the SEC.  The Form 10-Q continued to make claims that the Company was providing consumers with useful content using its software platform.  The Form 10-Q was signed by defendant J. Taylor and certified under SOX by both defendants J. Taylor and D. Taylor stating that the Form 10-Q contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 10-Q. The Form 10-Q stated:

***Current business overview***

Eco Science Solutions, Inc. is a technology-focused Company targeting the multi-billion-dollar health and wellness industry.

From enterprise software solutions, entertaining and useful content generation for mass distribution to consumer apps for daily use, the Company develops technical solutions that empower enthusiasts in their pursuit and enjoyment of building eco-friendly businesses and living healthy lifestyles.

Eco Science's core services span business location, localized communications between consumers and business operators, social networking, educational content, e-commerce, and delivery.

The Company's licensed e-commerce platform enables health-and-wellness enthusiasts to easily locate, access, and connect with health-and-wellness businesses and like-minded enthusiasts, and to facilitate the research of and purchasing of eco-friendly products … anytime, anywhere.

80.    On September 19, 2016, the Company filed its Quarterly Report on Form 10-Q for the fiscal quarter ending July 31, 2016 with the SEC.  The Form 10-Q reiterated the claims regarding the Company's products as the previous Form 10-Q.  The Form 10-Q was signed by defendant J. Taylor and certified under SOX by both defendants J. Taylor and D.  Taylor that the Form 10-Q contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 10-Q.

81.    On December 2, 2016, the Company filed its Quarterly Report on Form 10-Q for the fiscal quarter ending October 31, 2016 with the SEC.  The Form 10-Q reiterated the claims regarding the Company's products as the previous Forms 10-Q.  The Form 10-Q was signed by defendant J. Taylor and certified under SOX by both defendants J. Taylor and D. Taylor that the Form 10-Q contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Form 10-Q.

82.    The Company's 2016 Form 10-K filed with the SEC on May 1, 2017, alleged that the Company had entered a promising "unique investment and acquisition opportunities that are both synergistic and accretive to the Company" with the so-called Ga-Du Bank.  The Form 10-K stated:

The following is to provide a road-map for how the Company intends to prepare for and generate revenues, along with the costs associated to do so. Eco Science Solutions' core Initiatives are centered on five main areas: 1) continued consumer and enterprise technology investment, 2) continued product development through Scientific Research and Development; 3) inventory build for distribution, and *4) strategic acquisitions that provide an accelerated time-frame to secure market share*; 5) development of Sales, Customer and Finance personnel depth to support accelerated revenue growth.

\* \* \*

*Strategic acquisitions – Due to various hyper-growth trends in segments of the holistic health and wellness category, Eco Science Solutions believes that it will be presented with unique investment and acquisition opportunities that are both synergistic and accretive to the Company.* The Management Team has already identified several candidates. The Company has not budgeted an exact dollar amount for investment purposes in Strategic acquisitions over the next 12-month period.

83.   The 2016 Form 10-K reiterated the statements from the 2015 Form 10-K regarding the supposed value of the Fitrix and Herbo apps.  Furthermore, the 2016 Form 10-K touted the "UseHerbo" ecommerce platform and access to "The Pursuit of Fine Herb" original content, and that through defendants J. Taylor and D. Taylor, the Company "continues to source and release into the market relevant products for sale coupled with unique original, educational content."  In actual fact, the Company had purchased a worthless software platform for Eco Science shares to defendant Giguiere in furtherance of the Individual Defendants' pump-and-dump scheme.  The products produced no revenue for the fiscal year.

84.   Defendants J. Taylor and D. Taylor signed the Company's 2016 Form

10-K, and certified under SOX that the 2016 Form 10-K contained no untrue statement of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the 2016 Form 10-K.

85.     On May 5, 2017, the Company issued a press release entitled "Eco Science Solutions, Inc. Signs Letter of Intent to Acquire Specialty Banking Operation."   In the press release, the Company announced that it had signed a Letter of Intent to purchase the so-called Ga-Du Bank to provide financial servicing to growers, suppliers, distributors, retailers, and consumers in the cannabis industry.  The press release claimed that Ga-Du Bank received its charter through SCNRFP and that the bank had received preliminary commitments to deposit sums between $300 million to $600 million within the first 60 to 180 days following the acquisition.   However, there are no records or official sources corroborating the existence of Ga-Du Bank.  A Current Report on Form 8-K, filed with the SEC on May 24, 2017, enclosed the press release and letter of intent as exhibits.

86.     On June 26, 2017, the Company filed a Current Report on Form 8-K with the SEC after it lifted its suspension of trading.  The Form 8-K announced that the Company would continue to pursue its acquisition of Ga-Du Bank despite the fact that the SEC expressed skepticism about the transaction.  Instead, in an

effort to continue to keep the stock afloat through the promise of this transaction, these defendants asserted that there was potential to "create additional revenue streams for a combined entity."  Additionally, by integrating this supposed financial institution, the Company would capitalize on e-commerce and enterprise opportunities by providing financial services to medical marijuana market. Defendants J. Taylor and D. Taylor compared this transaction to "when Amazon.com entered into [the] consumer retail market."

## **REASONS THE STATEMENTS WERE IMPROPER**

87.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

a)  the Company was compensating defendant Giguiere to artificially inflate the value of the Company's stock as part of a pump-and-dump scheme;

b)  the mobile phone apps and other products advertised by the Company were essentially worthless;

c)  the Company engaged in several sham transactions designed to enrich Giguiere at the expense of the Company;

d)  the Company disseminated false information about its acquisition of

Ga-Du Bank regulated by a nonexistent, allegedly sovereign Native American tribe;

e) the Company made assertions about the sham transaction with Ga-Du Bank in an effort to keep the Company's inflated stock price afloat;

f) the Company was engaged in a pump-and-dump scheme; and

g) as a result of the foregoing, the officers' and directors' representations concerning the Company's operations were improper.

## ARTICLES REVEAL THE INDIVIDUAL DEFENDANTS' PUMP-AND-DUMP SCHEME AND SHAM TRANSACTIONS

88.    In an article published by *Seeking Alpha* on December 15, 2016, entitled "Eco Science Solutions: Dangerously Promoted With Nearly 100% Downside," the author reported that the Company was engaged in a "pump-and-dump scheme."  The article stated that the scheme was designed to promote the Company's stock and inflate its price, while the primary products, Fitrix and Herbo apps, were effectively worthless. The article stated:

> Eco Science Solutions (OTC:ESSI) is a pump-and-dump scheme with a 100 percent downside. It is simply dumbfounding how ESSI has been able to garner an enterprise value of around $77 million with a portfolio of assets that has seemingly little to no value.

**The Pump**

A financial media company called The Money Street   (TMS) published a series of articles on Eco Science ... going so far as saying that ESSI has the ***potential to become the next Amazon (NASDAQ:AMZN)  or Uber (Private:UBER) of the cannabis***

*industry*.

\* \* \*

TMS gets compensated between $25,000 and $150,000 to pump up stocks like ESSI … and looking at the stock chart below, ESSI has been pumped to the hilt.

\* \* \*

**So… What Does ESSI Do?**

ESSI is tackling both the health and wellness industry and the cannabis market. By tackle, I mean the following: Developing two YouTube channels, which so far have a ***COMBINED*** subscriber base of six people; and managing two mobile apps, both of which have between 100 to 500 downloads on the Android market, and one of which has a five-star review written by some guy who just so happens to share the same name as ESSI's chief financial officer.

The growth story largely comes from ESSI's "Herbo" and "Fitrix" apps. Herbo uses the smartphone's GPS tracker to "help you find MMJ dispensaries, smoke shops, legal doctors, clinics, and delivery services in your area…." According to ESSI, the app has over 14,000 locations that make up the marijuana smoke chain.

The other app, Fitrix, "helps you keep track of your day-to-day fitness habits and routines." This app has features such as a BMI calculator, fitness radio, weight loss calculator, a daily log, and other generic features. According to an angry reviewer on the app store:

> "This app has almost useless levels of functionality - for the parts that work. ***It seems more of a developer's first learning app than anything meant to be used***… only plus is it's free so it can't hurt your wallet."

\* \* \*

It is also helpful to note just how easy it is to make mobile apps these days. For instance, a couple years ago, I decided to develop my own app. I knew nothing of app making, but for just a few hundred dollars,

I was able to hire a programming and design team from India to develop an app from scratch. In just two weeks, the app was completed and was ultimately downloaded just a few hundred times, generating close to nothing in revenue. Perhaps, considering how richly valued ESSI is, my app should have also been worth a few million dollars as well!

\*   \*   \*

**Valuation and Conclusion**

The financial health of ESSI is the nail in the coffin. For starts, ESSI has not been able to generate *ANY* sales, and as a result, the company has burned through $12.5 million in shareholder capital since inception!

With only $70K in cash and almost $900K in payables on the balance sheet, the company will continue to cling to the capital markets for survival. An annual cash burn rate of +$200K also does not help.

Since it looks like the company will have no hope in successfully generating cash flow to support its significant debt load, my target price for ESSI is $0, or 100 percent down from the stock's current levels.

89.     As the contents of the article reached investors over the next several days, the stock price precipitously declined almost 47% to $1.43 per share by December 20, 2016, representing a loss of $1.25 per share, or a $40.9 million market capitalization loss.

90.     Then on May 15, 2017, a more detailed article was published on *Seeking Alpha* that elaborated on the pump-and-dump scheme and sham transactions between the Individual Defendants, which were designed to enrich themselves at the expense of the Company.   The article detailed defendant

Giguiere's use of similar schemes in the past wherein he received shares through third-party marketing companies he had set up, proceeded to inflate the value of the stock despite a lack of a substantive product or service, and sell those shares before the stock became toxic.   Through a series of sham transactions with companies owned or operated by defendant Giguiere, the author argued that Eco Science was engaged in the same scheme by highlighting several articles over the course of 2016 on *TheMoneyStreet.com* that promoted Eco Science as the next Amazon, when in reality the Company's products were effectively worthless.   The article stated:

**Summary**

- Thanks to a small float and an ongoing stock promotion, Eco Science Solutions has been up over 700% over the last twelve months.

- Today, however, the size of its float has exploded overnight as a registration statement for 14 million newly issued shares has been declared effective.

- The person indirectly holding those shares has previously been CEO of Eventure, a publicly traded company with an uncanny number of similarities to Eco Science Solutions.

- Eventure's stock price dropped from 3.50 into the triple zeroes

in 2014 after a series of toxic financing deals. Eco Science Solutions has now obtained identical toxic financing.

- I believe history will repeat itself and Eco Science Solution's stock will shortly follow Eventure's down the drain.

**Introduction**

\*   \*   \*

On the 15th of December 2016, author Anthony Thorpe published an article on Seeking Alpha about a company called Eco Science Solutions (OTC:ESSI). He convincingly argued shares are worthless. Anyone who has taken a few minutes to do some basic due diligence on Eco Science will agree with him. The company solely owns two extremely basic apps nobody uses or has even heard of. Nevertheless, Eco Science currently has a $110 million market cap.

\*   \*   \*

In his article, Thorpe mainly focused on Eco Science itself, and its unlikely management. To really understand what's going on here, and to predict when the ESSI share price will finally dump for the last time before sinking away into oblivion, I suggest we look a bit deeper. In this article, I'll argue the company, as well as its management, are irrelevant and merely part of a vehicle that was set up to transfer shares to a third party. ***And in this case, that particular third party has pulled off an almost identical scheme just a few years ago, with that stock now trading at zero.***

\*   \*   \*

**2016-2017: Eco Science Solutions** *ESSI and Giguiere's Separation*

*Degrees*

After the IPO of Separation Degrees - One fell through, Giguiere seems to have changed his plans. He no longer tried to IPO his own company, and instead appeared to change his focus to a company that's already listed. In January of 2016, Separation Degrees signed a

"technology licensing and marketing support agreement" with an obscure, illiquid publicly traded entity called Eco Science Solutions, trading under the ticker ESSI. A majority stake in this company had (not coincidentally) just been bought by two brothers from Hawaii one month before (for more information on the Taylor brothers, see Anthony Thorpe's article). The agreement between Eco Science and Separation Degrees entailed, among others, for the third time this article, the sale of a mysterious "software platform."

Over 2016, the collaboration between Eco Science and Separation Degrees resulted in (again) two, very basic apps being brought to market, Herbo and Fitrix. Both apps are free, both are extremely basic (I personally tried Fitrix: by far the most impressive thing it does is offer an ability to calculate your Body Mass Index) and both are being downloaded or used by virtually nobody.

During 2016, Separation Degrees has send [sic] invoices to Eco Science totaling *over $2 million*. This includes $1.8 million in "advertising services." I have no idea what exactly was advertised. It surely weren't [sic] the apps, as even Google doesn't seem to know what, for example, the Fitrix app even is.

\*   \*   \*

But maybe Separation Degrees didn't advertise the apps on behalf of Eco Science, but instead advertised its stock. The website themoneystreet.com has been promoting ESSI stock for months now. Coincidentally (or not), that same website also used to promote EVTI stock.

\*   \*   \*

I've asked TheMoneyStreet if they have been compensated for running the ESSI promo, as they offer no clear disclosure. They did not reply.

Eco Science and Separation Degrees initially agreed invoices would be paid not in cash (which Eco Science doesn't have), but instead would be paid in shares. Later, both parties agreed to settle all outstanding invoices from 2016 by Eco Science issuing 4 million shares to Giguiere's Separation Degrees. At the current market price,

these shares are worth about $10 million. Not a bad deal at all considering the original invoices amounted to about $2 million.

However, it's important to realize these shares cannot legally be re-sold in the open market without a valid S-1 registration statement being approved by the SEC.

*ESSI and Giguiere's Phenix Ventures*

In January of 2017, Eco Science also signed an Equity Purchase Agreement with an entity called Phenix Ventures LLC. By now, anyone reading this article will not be surprised that Phenix Ventures is ALSO in fact owned by Gannon Giguiere.

\*   \*   \*

The agreement states Eco Science will sell to Phenix ten million shares of the company's stock, at a price "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered to Investor."

Such an agreement is a fine example of toxic financing. Phenix gets to buy stock at a discount to the market price, sell those shares for a profit, which makes the share price fall, where Phenix is again able to buy at a discount, etcetera. Actually, it's the exact same type of financing that tanked the Eventure Interactive share price to zero.

And that's not where the similarities end. The Equity Purchase Agreement signed by Eco Science with Phenix is almost an exact copy of the Equity Purchase Agreement signed by Eventure Interactive with toxic financier N600PG two years previous.

\*   \*   \*

Both deals through two separate entities have given Gannon Giguiere pole position in taking full advantage of the inflated Eco Science share price in the short term. He's now sitting on four million shares, plus has the right to acquire another ten million shares at a hefty discount, and sell them in the open market for a big profit. All it still takes is those shares being registered for re-sale.

91.   The author of the May 15 *Seeking Alpha* article further contended that the Company's proposed acquisition of Ga-Du Bank is a sham, masterminded by defendant Giguiere.   The article stated that the transaction was designed to keep the stock afloat until the Form S-1 Registration Statement filed with the SEC was approved, thus allowing defendant Giguiere to dump his stock:

> On January 26th, Eco Science filed with the SEC an S-1 registration statement. These registration statements are usually declared effective by the SEC within weeks, but on this occasion, it took close to four months, and two amendments.
>
> As the ESSI share price began to slide during that unexpectedly long waiting period, the company made ever more desperate attempts to keep traders interested. This included a press release saying the company had signed a "Letter of Intent" to buy a bank, with supposedly "commitments" from prospects" "to deposit sums between $300 million and $600 million."
>
> Sounds good? Well, the internet has never heard of this so-called "Ga-Du Bank," and it's regulated by (or, in fact, is; it's all a bit confusing to say the least) the newly founded Central Bank of the "Southern Cherokee Nation and The Red Fire People." Claiming to be a sovereign nation based on an 18th century US Supreme Court ruling (and quite possibly the only government in the world you can contact per e-mail through a Gmail-address), it's not on the list of 566 Native American tribes legally recognized by the US.
>
> Apparently, even Eco Science itself wasn't too impressed: while it did send out a PR, it never filed an 8-K with the SEC, which is an obligation to public companies when they have material news to report. I agree with the company the banking business is immaterial (and, besides, of a questionable legality, but I'll leave that to the experts), but is most of all a poor attempt to distract investors from impending doom.
>
> Anyway, I digress. By far, the most important news for ESSI shareholders over these last couple of months is the SEC has today

58

declared the registration statement effective, making it possible for Giguiere to start selling stock legally now. Based on the uncanny number of similarities between Eventure Interactive and Eco Science Solutions, I strongly believe history will repeat itself: Eco Science's extended run will soon be over. With dilution in full swing, I believe Giguiere will run yet another share price straight into the ground.

**Conclusion**

Eco Science Solutions must be one of the most cynical publicly traded "companies" I've ever come across. While many OTC-listed small caps have very little substance, at least most of them fake doing something. Eco Science Solutions doesn't even bother. After having created two extremely basic apps and now apparently a move into tribal "banking," the company to me seems ready to move on to the real purpose of this operation: printing new stock.

With a small float, lots of volatility and several great "buy the dip" opportunities, ESSI stock has been a day trader's dream in 2016 and 2017. It's fundamentally worthless though, and it doesn't take a genius to see this. But there's no shortage of OTC stocks which are clear "zeroes." And most of them, like ESSI, have excessive borrow rates, which make shorting tremendously expensive. The most difficult question is not determining the value, but when the bubble will finally pop. If you're right about the value, but completely wrong about the timing, you'll likely lose anyway.

With the SEC now having declared effective the S-1 statement registering an additional 14 million shares in the hands of a person with, shall we say, a "colorful" history and a strong incentive to sell sooner rather than later, I believe the catalyst that will pop this bubble has finally arrived.

92.    On this news, Eco Science's stock plummeted more than 9%, or $0.23 per share on May 16, 2017, to close at $2.17 per share compared to the previous trading day's closing of $2.40, erasing more than $10.4 million in market capitalization.

## SEC SUSPENDS TRADING IN THE SECURITIES OF ECO SCIENCE

93.    On May 12, 2017, after four months of waiting on the SEC's response to the Company's Form S-1 Registration Statement for its issuance of stock to defendant Giguiere's entities SDOI and Phenix, the SEC finally gave its Notice of Effectiveness.  But the window to dump those shares, however, was short-lived.  In a release dated May 19, 2017, the SEC announced that it would be temporarily suspending trading of Eco Science stock.  In the release, the SEC expressed its concern about the "accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga-Du Bank, Inc." The SEC's release stated:

> The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of Eco Science Solutions, Inc. ("ESSI"), of Malawea, Hawaii at 9:30 a.m. EDT on May 22, 2017, and terminating at 11:59 p.m. EDT on June 5, 2017.
>
> ***The Commission temporarily suspended trading in the securities of ESSI because of concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga-Du Bank, Inc. This order was entered pursuant to Section 12(k) of the Securities Exchange Act of 1934 (Exchange Act).***
>
> The Commission acknowledges FINRA's assistance in this matter.
>
> The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to ESSI's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

94.     Even though the SEC lifted the suspension on trading on June 5, 2017, as stated in the agency's May 19, 2017 release, the damage was done.  The Company's stock plummeted by closing on June 6, 2017, dropping to $0.65 per share, a steep decline of $1.72 per share, compared to the Company's closing price of $2.37 on May 19, 2017.   This decline erased $78 million in market capitalization or 72.5% of the stock's value.

**Defendants Continue to Push the Ga Du Acquisition**

95.     Despite the suspension of trading, the Company continued to push the acquisition of Ga Du Bank which incorporated as Ga Du "Corporation" in Nevada ("Ga Du") in a Current Report on Form 8-K, filed with the SEC on June 26, 2017 (the "June 26, 2017 Form 8-K").   Filed subsequent to the SEC lifting its suspension, the June 26, 2017 Form 8-K claimed that Eco Science would no longer

engage in commercial operations through the SCNRFP.   The parties to the transaction also averred that they would not be seeking a banking charter through the SCNRFP.   Instead, the June 26, 2017 Form 8-K reported that Ga Du's management had agreed to become a subsidiary of Eco Science despite the loss of commitment from SCNRFP.  Ga Du's current management includes CEO Lewis and COO Oveson, who are also directors of Eco Science and defendants in this case.  The June 26, 2017 Form 8-K stated:

> Previously, on May 2, 2017, ESSI entered into a Letter of Intent with Ga Du Bank, a banking platform with a charter through the Southern Cherokee Nation Red Fire People ("SCNRFP"). *After completing its due diligence, ESSI determined that while the banking platform technology was capable and had many advantages, the overall charter and the ability to engage in some of the desired commercial operations through the SCNRFP was not sufficiently developed by SCNRFP to meet the expectations of ESSI.* In light of this, each of ESSI and Ga Du determined not to proceed with the acquisition of the banking charter. Ga Du, however, has continued the refinement of its platform for data capture, financial services, and compliance platform, to develop mobile enterprise applications and to work with existing commercial banks, along with its other enterprise services activities. *Ga Du's management team determined that the direction and vision of ESSI aligned with the interests of Ga Du, and seeing the potential to create additional revenue streams for a combined entity, the Ga Du management team agreed unanimously to become a subsidiary of ESSI and bring to market its other activities under the Eco Sciences brand.* With the acquisition of Ga Du Corporation, ESSI has now acquired the Ga Du technology, along with its other activities such as Certified Laboratory Testing and Retail Inventory Control, bringing important enterprise technologies in-house.
>
> Background on Ga Du Corporation and Ga Du's nature of relationship with ESSI Ga Du Corporation ("Ga Du") was originally an association of individuals who had experience in one or more phases of the

Cannabis industry (see Bios below) and wished to collaborate to develop and/or discover business opportunities in the industry that were unrelated to sale of Cannabis products. Ga Du felt that there was a lack of business sophistication and business tools in the industry as a whole, and that a significant opportunity existed to supply those.

96.   To keep the stock afloat, the June 26, 2017 Form 8-K continued to tout the alleged value of integrating Ga Du into Eco Science's business. Eco Science asserted it could now capitalize on e-commerce and enterprise opportunities by providing financial services to the medical marijuana market, analogous to "when Amazon.com entered into [the] consumer retail market." The Form 8-K stated:

How Ga Du is related to ESSI's operating business

The Cannabis industry that ESSI and Ga Du are working to penetrate, remains fragmented, with rather small owner/operators, all whom are servicing their customer base with limited technologies, unsophisticated business processes and non-existent financial services. *While forecasts have the Medical Marijuana industry as quite large, there remains a lack of technologies, business process and financial services that allow for the enterprise and the consumer to transact in an efficient manner. Management believes an analogy can be made that when Amazon.com entered into consumer retail market, the overall categories they targeted presented similar inefficiencies. This premise implies that there are tremendous ecommerce and enterprise opportunities in front of a combined Eco Science Solutions and Ga Du.*

ESSI has developed, and offers, a consumer engagement application; e-wallet; location and delivery technologies; e-commerce platform; and a rich educational content platform.

Ga Du has developed, and offers, a security software to capture and retain customer and membership data, to accommodate KYC and compliancy matters for various kinds of financial services; a flexible

mobile payment platform to facilitate payment for all kinds of services and products in collaboration with an experienced provider.

*When combined, ESSI and Ga Du will have the capability to vertically satisfy the entire transaction flow from consumer to enterprise with a keen focus on the underserved Cannabis industry. The parties believe that this first mover advantage may give the Company a significant competitive advantage on a long-term basis.*

97.    The June 26, 2017 Form 8-K further revealed that defendant Oveson had coordinated efforts to combine the entities on behalf of Ga Du.  The Form 8-K stated:

Concurrently with work previously commenced on a proprietary banking and compliance software, Ga Du commenced to seek a correspondent relationship with various banks and to develop merchant processing relationship(s). *During the later period of this process, Ga Du was introduced to Eco Science Solutions Inc. ("ESSI") by Mr. Randal Oveson. Mr. Oveson was aware of Ga Du's work with SCNRFP.* Ga Du indicated to ESSI that it believed that it would soon have a solution for cannabis banking with SCNRFP. While Ga Du had received a license from SCNRFP it had not yet received an opinion letter as to sovereignty. Ga Du continued its development work on merchant processing and other payment solutions to assist merchants to avoid the handling of large amounts of cash, and on a depository system for taking cash deposits and digitizing such deposits.

98.    Despite their approval and participation in the Ga Du transaction, designed to keep the Company's stock afloat in furtherance of the Individual Defendants' pump-and-dump scheme, defendants Lewis and Oveson were appointed as directors of Eco Science on June 21, 2017.

99.    Further, on October 6, 2017, the Company filed a Current Report on

Form 8-K with the SEC that reported that Ga Du had "entered into an Assignment Agreement with G&L Enterprises, wherein G&L Enterprises assigned, to Ga Du Corporation, all of its rights, interest in, and obligations under a License and Master Marketing Agreement (LMMA) it entered into with [Alliance] on September 6, 2017."   Through the LMMA, the Company hyped Alliance's supposed financial and marketing services to businesses in the cannabis industry, deriving fees and income from enrolling companies on a "programmatic or membership basis" and providing a range of financial services to the cannabis industry.  The Form 8-K also alleged that, attendant to the LMMA, Alliance would provide financial and marketing services software platform through its eXPO, or electronic eXchange Portal, mobile app.   In furtherance of this transaction, designed to keep the stock afloat, Ga Du agreed to issue 200,000 shares of Eco Science common stock to Alliance.

100.  In total during the relevant period, due to the Individual Defendants' pump-and-dump scheme and sham transactions, the Company's stock has eroded, dropping from a high on January 20, 2017 of $4.58 per share to a low of $0.28 per share on June 12, 2017, a loss of $4.30 per share.  Overall, market capitalization has fallen more than $137 million, or approximately 91% of its value.  The Company's stock has yet to recover.  Similar to Eventure, defendant Giguiere's involvement in Eco Science has caused its stock to become inflated, and quickly

erode when the schemes and sham transactions were revealed:



### The Officer Defendants and Director Defendants Line Their Pockets Despite Wrongdoing

101.   Defendants J. Taylor and D. Taylor also lined their own pockets while the Company's stock price was artificially inflated.  As reported in the Company's 2016 Form 10-K, defendants J. Taylor and D. Taylor had provided themselves with three million Eco Science shares on January 13, 2017, worth $8,190,000 each at the time of issuance, in a self-dealing transaction.  Defendants J. Taylor and D. Taylor claimed that their drastic increase in shares were "stock-based compensation recorded as management fees" for serving as CEO and CFO, respectively.  Furthermore, despite their participation in the pump-and-dump scheme at the Company's expense, defendant J. Taylor paid himself a salary of $115,000 for the year, and D. Taylor a salary of $105,000 in a self-dealing transaction.

102.    Additionally, defendants Lewis and Oveson were provided annual salaries and stock options as part of Employment Agreements signed in the Ga Du transaction, despite aiding and abetting in the wrongdoing designed to keep the Company's stock afloat.  In exhibits attached to the June 26, 2017 Form 8-K, the Company revealed that it would provide defendants Lewis and Oveson $120,000 each in annual salary for taking on the role of director.  Defendant Lewis was also given the option to purchase 2.5 million of common stock at the discounted price of $2 per share, to vest in twenty-four months.  Defendant Oveson was similarly given the option to purchase 1.5 million of common stock at the same option price to vest in twenty-four months.

103.    As confirmed by the Form 10-Q filed with the SEC on November 3, 2017, for the quarterly period ended July 31, 2017, on June 21, 2017, Ga-Du Corporation, now a wholly owned subsidiary of Eco Science, entered into employment agreements with defendants Lewis and Oveson by which they accepted employment as CEO and COO, respectively, of Ga Du for base salaries of $120,000.  In addition, the Form 10-Q states that Eco Science issued 16,000,000 shares of restricted stock pursuant to the Stock Purchase Agreement with the founders of Ga-Du Corporation, including defendant Lewis.[7]

---

[7] The Form 10-Q further notes, in part, that the 16,000,000 shares of restricted stock were issued to defendant Lewis as "Deep Spring Holdings LLC" in the amount of 2.15 million shares and to defendant Oveson as "Advisor to L. John

## DAMAGES TO ECO SCIENCE

104.   As a result of the Individual Defendants' improprieties, Eco Science disseminated improper, public statements concerning the Company's operations and its transactions with SDOI, Phenix, and Ga-Du Bank.   These improper statements have devastated Eco Science's credibility as reflected by the Company's almost $137 million, or 91%, market capitalization loss.

105.   As part of the Individual Defendants' scheme, defendants J. Taylor and D. Taylor also approved the issuance of millions of shares of valuable Eco Science stock to defendant Giguiere for worthless products and services. Additionally, in a self-dealing transaction, defendants J. Taylor and D. Taylor approved the issuance of millions of Eco Science stock to themselves, as well as annual salaries, despite their participation in the wrongdoing described herein.

106.   The Individual Defendants' unlawful course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with securities class action lawsuits filed in the U.S. District Court for the District of New Jersey.   The class action lawsuits allege that the Company and certain   Individual   Defendants   violated   securities   laws   by   repeatedly misrepresenting that the Company's business, operations, and prospects.

107.   Eco Science's participation in a pump-and-dump scheme and use of

Lewis" in the amount of 1 million shares.

sham transactions to manipulate the true value of the Company's equity also damaged its reputation within the business community and in the capital markets. In addition to price, Eco Science's current and potential customers consider a company's trustworthiness, stability, and ability to accurately describe its business operations.   Investors are less likely to invest in companies that disseminate improper statements, are subject to temporary suspensions of trading, and are uncertain of their own financial conditions.   In the wake of the revelation that the SEC has expressed concerns regarding the accuracy and adequacy of the Company's publicly disseminated information, Eco Science's ability to raise equity capital or debt on favorable terms in the future is now impaired.   Furthermore, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

108.   Further, as a direct and proximate result of the Individual Defendants' actions, Eco Science has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

a)   costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

b)   costs incurred to investigate wrongdoing; and

c)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Eco Science.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.   Plaintiffs bring this action derivatively in the right and for the benefit of Eco Science to redress injuries suffered, and to be suffered, by Eco Science as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Eco Science is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.   Plaintiffs will adequately and fairly represent the interests of Eco Science in enforcing and prosecuting its rights.

111.   Plaintiffs were stockholders of Eco Science at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Eco Science stockholders.

112.   At the time the first complaint was filed in this consolidated action, the Board of Eco Science consisted of the following four individuals: defendants J. Taylor, D. Taylor, Lewis, and Oveson.  Plaintiffs did not make a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

113.   As alleged above, defendants J. Taylor and D. Taylor breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's business, operations, and prospects.

114.   Defendants J. Taylor and D. Taylor caused or sanctioned agreements with entities owned and operated by defendant Giguiere that harmed the Company. In implementing those agreements, defendants J. Taylor and D. Taylor recklessly or knowingly permitted the use of a deceptive pump-and-dump scheme designed to manipulate the true value of the Company's equity value.  To execute this scheme, defendants J. Taylor and D. Taylor caused or allowed the Company to engage in a Technology Licensing and Marketing Support Agreement with SDOI to inflate  the Company's stock.  These defendants also engaged in a toxic financing transaction with Phenix, a company also owned by defendant Giguiere.  Finally, defendants J. Taylor and D. Taylor claimed that it was purchasing the so-called Ga-Du Bank in the Company's public filings and press releases to keep the stock price afloat. Defendants J. Taylor's and D. Taylor's material misrepresentations regarding these sham transactions have caused the Company harm by damaging its reputation, leading to a marked loss in market capitalization, and exposing the Company to several securities class action lawsuits alleging violations of federal securities laws. Because  defendants  J.  Taylor  and  D.  Taylor  face  a  substantial  likelihood  of

liability, demand upon them is futile.

115.   Because defendants J. Taylor and D. Taylor approved the stock awards and compensation described herein and either received or awarded and received the challenged compensation, defendants J. Taylor and D. Taylor stand on both sides of the compensation awards.   Additionally, all the Director Defendants received the challenged compensation, and thus derived a personal benefit from and had a direct interest in the transactions at issue in this case.   Because they stand on both sides of the challenged compensation awards and received personal financial benefits from those awards, the Director Defendants lack disinterest, they will have the burden of proving the entire fairness of their compensation, and there is more than a reasonable doubt that the directors could impartially consider a demand.   Accordingly, demand on the Director Defendants is excused.

116.   Defendants Lewis and Oveson aided and abetted in the wrongdoing described herein by rendering assistance to the Individual Defendants in furtherance of their pump-and-dump scheme.   In particular, as alleged officers of Ga-Du Bank and directors of Eco Science, defendants Lewis and Oveson assisted in the promotion of the acquisition of the so-called Ga-Du Bank in order to keep the Company's stock price afloat.   By engaging in this sham transaction, defendants Lewis and Oveson have caused the Company harm by damaging its reputation, leading to a marked loss in market capitalization, and exposing the

Company to several class action lawsuits alleging violations of federal securities laws.  Because defendants Lewis and Oveson face a substantial likelihood of liability, demand upon them is futile.

117.   The principal professional occupation of defendants J. Taylor and D. Taylor is their employment with Eco Science, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendants J. Taylor and D. Taylor lack independence due to their interest in maintaining their executive positions at Eco Science.  This lack of independence renders defendants J. Taylor and D. Taylor incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation.

118.   Defendants J. Taylor and D. Taylor are brothers, and are incapable of impartially considering a demand to commence and vigorously prosecute this action against a family member.  Therefore, demand is futile as to defendants J. Taylor and D. Taylor.

119.   Defendants Lewis and Oveson, as officers of Ga-Du Bank, will not initiate litigation against defendants J. Taylor and D. Taylor as they are interested in the challenged transactions because of the unique benefit they received.

73

Defendants Lewis and Oveson were appointed to Eco Science's Board in connection with the Company's entry into a Stock Purchase Agreement with Ga-Du Bank.  Eco Science, under the direction and supervision of defendants J. Taylor and D. Taylor, agreed to purchase all of the shares of capital stock of Ga-Du Bank, in exchange for fifteen million shares of Eco Science common stock that shall be issued to Ga-Du Bank pursuant to the Stock Purchase Agreement.  In June 2017, Eco Science entered into an employment and/or consulting agreement with Ga-Du Bank, with defendants Lewis and Oveson serving as Ga-Du Bank's CEO and COO, respectively.   Concurrently, defendants Lewis and Oveson signed Employment Agreements to serve as directors on Eco Science's Board.   As compensation, defendants Lewis and Oveson are to receive substantial compensation in connection with this appointment.  Accordingly, demand is futile on defendants Lewis and Oveson.

120.   In addition, the Company acknowledged in its Forms 10-K filed on May 17, 2016, and May 1, 2017, that the Company's "disclosure controls and procedures were not effective"; its "internal control over financial reporting was not effective" and "material weaknesses" existed with respect thereto; and its "internal controls and procedures were not effective due to deficiencies that existed in the design or operation of [its] internal controls over financial reporting."  The Company further acknowledged that these control deficiencies included: (i) the

"[l]ack of an independent audit committee or audit committee financial expert, and no independent directors," which "may be counter to corporate governance practices as defined by the various stock exchanges and may lead to less supervision over management"; and (ii) "insufficient written policies and procedures for accounting and financial reporting with respect to the requirements and application of US GAAP and SEC disclosure requirements." These utter failures to ensure even the most basic controls further demonstrate that the members of the Board face a substantial likelihood of liability.

121.   Plaintiffs have not made any demand on the other stockholders of Eco Science to institute this action since such demand would be a futile and useless act for at least the following reasons:

a)   Eco Science is a publicly held company with over 45.3 million shares outstanding and thousands of stockholders as of June 8, 2017;

b)   making demand on such a number of stockholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

c)   making demand on all stockholders would force plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against Defendants J. Taylor, D. Taylor, Lewis, and Oveson for
### Breach of Fiduciary Duty

122.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

123.   Defendants J. Taylor, D. Taylor, Lewis, and Oveson owed and owe Eco Science fiduciary obligations.   By reason of their fiduciary relationships, defendants J. Taylor, D. Taylor, Lewis, and Oveson owed and owe Eco Science the highest obligation of good faith, fair dealing, loyalty, and due care.

124.   Defendants J. Taylor, D. Taylor, Lewis, and Oveson and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.   More specifically, defendants J. Taylor, D. Taylor, Lewis, and Oveson violated their duty of good faith by creating a culture of lawlessness within Eco Science, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

125.   Defendants J. Taylor, D. Taylor, Lewis and Oveson, as the officers and directors of the Company, either knew, were reckless or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. Moreover, defendants J. Taylor and D. Taylor breached their duty of loyalty by recklessly permitting the improper statements.   Defendants J. Taylor, D. Taylor, Lewis and Oveson either knew or were reckless in not knowing that: (i) the

Company was compensating defendant Giguiere to artificially inflate the value of the Company's stock as part of a pump-and-dump scheme; (ii) the mobile phone apps and other products advertised by the Company were essentially worthless; (iii) the Company engaged in several sham transactions designed to enrich defendant Giguiere at the expense of the Company; (iv) the Company disseminated false information about its acquisition of Ga-Du Bank regulated by a nonexistent, allegedly sovereign Native American tribe; (v) the Company made assertions about the sham transaction with Ga-Du Bank in an effort to keep the Company's inflated stock price afloat; and (vi) the Company was engaged in a pump-and-dump scheme.   Accordingly, defendants J. Taylor, D. Taylor, Lewis, and Oveson breached their duty of care and loyalty to the Company.

126.   Moreover, defendants J. Taylor and D. Taylor breached their fiduciary duty by compensating themselves three million shares each worth over $8 million at the time of issuance and paying themselves an annual salary of over $100,000 in a self-dealing transaction.

127.   As a direct and proximate result of defendants J. Taylor, D. Taylor, Lewis, and Oveson breaches of their fiduciary obligations, Eco Science has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

128.   Plaintiffs, on behalf of Eco Science, have no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Aiding and Abetting Defendants J. Taylor and D. Taylor's Breach of Fiduciary Duty**

129.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

130.   During all times relevant hereto, the Individual Defendants, collectively and individual, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Eco Science's business, operations, and prospects that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Eco Science, regarding the Individual Defendants' management of Eco Science's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at Eco Science and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

131.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to engage in the wrongdoing described herein and to issue improper statements.

132.   As a direct and proximate result of Individual Defendants' conspiracy,

common enterprise, and/or common course of conduct, Eco Science has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

133.   Plaintiffs, on behalf of Eco Science, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

134.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

135.   As a result of the sham transactions with entities owned and operated by defendant Giguiere, the Individual Defendants have caused Eco Science to waste its assets by compensating defendant Giguiere to promote the pump-and-dump scheme that has devastated the Company's reputation and financial standing. In particular, defendants J. Taylor and D. Taylor approved the purchase of supposedly proprietary messaging and customer relationship management "software platform" in an Asset Purchase Agreement from defendant Giguiere's company, SDOI.  This software platform, used in the creation of the Fitrix and Herbo apps, was effectively worthless and produced no revenue.

136.   The Individual Defendants have also caused Eco Science to waste its assets by paying themselves improper compensation and bonuses despite the breach of their fiduciary duty.

137.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

138.   Plaintiffs, on behalf of Eco Science, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

139.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

140.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Eco Science.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Eco Science.

141.   Plaintiffs, as stockholders and representatives of Eco Science, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

142.   Plaintiffs, on behalf of Eco Science, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Eco Science, demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, aiding and abetting, waste of corporate assets, and unjust enrichment;

B.    Directing Eco Science to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Eco Science and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1) a proposal to strengthen Eco Science's oversight of its transactions and agreements with outside entities;

2) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3) a provision to permit the stockholders of Eco Science to nominate at least one-third of the candidates for election to the Board; and

4) a proposal to strengthen Eco Science's oversight of its disclosure

procedures;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Eco Science have an effective remedy;

D.     Awarding to Eco Science restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

Dated: San Diego, California, <u>February 23, 2018</u>.

ROBBINS ARROYO LLP

<u>/s/ *Shane P. Sanders*</u>
SHANE P. SANDERS (*pro hac vice*)

*Attorneys for Plaintiff Ian Bell*

WEINBERG, ROGER & ROSENFELD
ASHLEY K. IKEDA 2955-0
Central Pacific Plaza
220 South King Street, Suite 901

Honolulu, HI 96813
Telephone: 808-528-8880
Facsimile: 808-528-8881
E-mail: aikeda@unioncounsel.net

*Attorneys for Plaintiffs Ian Bell and Marc D'Annunzio*

RM LAW, P.C.
RICHARD A. MANISKAS (*pro hac vice*)
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com

*Attorneys for Plaintiff Ian Bell*

HYNES KELLER & HERNANDEZ, LLC
BETH A. KELLER (*pro hac vice*)
118 North Bedford Road, Suite 100
Mount Kisco, NY 10549
Telephone: 914-752-3040
Facsimile: 914-752-3041
E-mail: bkeller@hkh-lawfirm.com

*Attorneys for Plaintiff Marc D'Annunzio*